UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

MIAMI DIVISION

CASE NO. 1:18-cv-22208-UU

**NEIMAN NIX and**
**DNA SPORTS PERFORMANCE LAB, INC.,**

      Plaintiffs,

vs.

**ESPN, INC., et al.,**

      Defendants.

_____/

**PLAINTIFFS' OMNIBUS RESPONSE TO  DEFENDANTS**
**ESPN, INC., USA TODAY INTERNATIONAL CORPORATION, AND**
**THE ASSOCIATED PRESS, INC's MOTION**
**TO DISMISS COMPLAINT AND**
**INCORPORATED MEMORANDUM OF LAW**

      Plaintiffs NEIMAN NIX ["Nix"] and DNA SPORTS PERFORMANCE LAB, INC. ["DNA Sports"] file their Omnibus Response in Opposition to Defendants ESPN, INC. ["ESPN"], USA TODAY INTERNATIONAL CORPORATION ["USA TODAY"], and THE ASSOCIATED PRESS, INC.'s ["AP"] Motions to Dismiss their Complaint.

      **Introduction.**  This case arises out of an article published by AP on July 14, 2016 falsely alleging that Nix and DNA Sports admitted to using substances that are on Major League Baseball's ["MLB"]'s list of banned substances.  The same false allegation was subsequently republished by ESPN and USA TODAY on their respective websites.

      At best, the articles falsely imply that Nix and DNA Sports admitted to violating MLB's rules regarding the sale of banned substances to MLB players—which they did not.  At worst, the articles falsely imply that Nix and DNA Sports admitted to knowingly providing MLB players

with illegal drugs—which they did not.  Either way, the statement is defamatory and actionable under Florida law.[1]

## BACKGROUND

Nix is a former professional baseball player who has used his knowledge of baseball to become a successful entrepreneur.  In 2006, Nix opened a training and development center for athletes in Seattle.  Comp, ¶ 11.[2]  He subsequently relocated the business to Clearwater, Florida, where he received regular visits from scouts for all 30 MLB teams.  *Id.*  Many of his athletes subsequently signed contracts with professional sports teams.  *Id.*  He later sold this business, which he continued to operate in Florida, to the American Baseball Institute in 2011.  Comp., ¶ 12.

The following year, Nix opened a state-of the-art sports science center in Miami Beach, where he was residing, called DNA Sports Performance Lab.  Comp., ¶ 13.  Part of the business focused on working with athletes to scientifically analyze their physical and psychological profiles to determine what exercise regimen, training, and diet best enhanced their performance.  *Id.*  The other part involved the sale and manufacture of natural health supplements known as "bio-identical compounds" or "nutraceuticals," one of which is derived from antler tissue naturally shed by elk and commonly referred to as "deer antler" or "deer velvet."  Comp., ¶¶ 13-14.  Although deer antler may contain trace amounts of  IGF-1[3],  it is not on the list of banned substances by either

---

[1] AP argues, as do its co-defendants, that this case is controlled by New York substantive law. As explained *infra,* however, it is wrong.

[2] "Comp." refers to the complaint filed in this action.

[3] There are two types of IGF-1: natural and synthetic (bioidentical) IGF-1.  Affidavit of Neiman Nix, ¶ 12 ["Nix Affidavit"], attached hereto as Exhibit A; *Singh v. PGA Tour*, *Inc*. Case No. 2013-651659, Doc. No. 182 (N.Y. S. Ct. 2013), attached hereto as Exhibit B ["Korenman Disclosure"];  Synthetic IGF-1 is a Schedule III controlled substance which is prohibited from

MLB or the World Anti-Doping Agency ["WADA"].[4]  *See* Exhibit C attached hereto; Nix Aff. ¶ 14.

On July 14, 2016, AP published an article bearing the headline, "The owner of a training and sports medicine clinic sued Major League Baseball and several of its employees Thursday, claiming they caused the company's social media accounts to be illegally hacked during the sport's Biogenesis investigation."[5]  [D.E. 11-1].[6]  The article stated that Nix, the owner of a training and sports medicine clinic, filed suit against MLB in federal district court in Manhattan, alleging that MLB tortiously interfered with his business.  *Id.*  The article contained the following statement:

> The suit admits Nix and his company used Bioidentical Insulin like Growth Factor (IGF-1, which is derived from elk antlers and is on baseball's list of banned substances.

*Id.*  The article went on to state that Nix's attorney "also represents former Mets closer Jenrry Mejia, who was banned for life in February following his third positive drug test," and that "[t]he Biogenesis investigation led to the suspensions of more than a dozen players, including Yankees star Alex Rodriguez."  *Id.*

---

being sold without a prescription.  Nix Aff. ¶ 12. Bioidentical IGF-1, on the other hand, is a natural hormone which is found in humans, as well as products such as milk or the velvet of deer antlers.  Nix Aff. ¶ 12; Korenman Disclosure.

[4] WADA is the agency responsible for setting and enforcing standards for the use of performance enhancing drugs in professional sports.  Nix Aff. ¶ 13.

[5] Biogenesis was a clinic located in Coral Gables which was criminally prosecuted by the United States Attorney's Office for the Southern District of Florida for supplying illegal steroids to several MLB players, including Alex Rodriguez, who is mentioned in the AP article.  *See United States of America v. Anthony Publio Bosch*, Case No. 14-20555-CR-GAYLES.  The owner of Biogensis, Anthony Bosch, pled guilty to conspiracy to distribute a Schedule III controlled substance.  *Id.* at  D.E 2, 57; attached hereto as Composite Exhibit D.

[6] The headline for the ESPN article read: "Training clinic alleges MLB hacked accounts *in Biogensis Probe*."  (emphasis added).  The headline of the USA Today article read, "Training Clinic Owner Sues MLB, Alleging Illegal Hacking."

The federal court complaint on which AP based its July 14, 2016 article also contained the following allegations:

- DNA Sports Lab is a diagnostic training and sports medicine clinic that specializes in the research and development and sale of natural and bio-identical substances to serve *as an alternative to harmful performance-enhancing drugs like synthetic anabolic steroids.*

- Indeed, Nix purchased innovative machinery such as body scanners, hyperbaric chambers, dyno strength machines, bio-electrical medical devices, and motion image tracking machines in order to test and research existing performance-enhancing supplements with a team of hired doctors *in order to develop new, safe, effective, and legal supplements.*

- Nix, through DNA Sports Lab, does not work with MLB players at DNA Sports Lab and has never tried to market or recommend this product to any MLB player or knowingly sold his product to an MLB player.

- Nix has never sold testosterone or anabolic steroids and refers any clients seeking hormone based products to outside medical doctors.

- In fact, Nix's goal in starting DNA Sports Lab was to help eliminate harmful performance-enhancing drugs by creating natural and safe alternatives that do not require a prescription.

- At no time did Nix sell and/or recommend any of his products to any MLB players, nor is he aware of any third party attempting to do the same with his products.  No MLB player has ever tested positive for any such substance sold by Nix.

*See* Complaint, ¶ ¶ 33, 35, 42, 43, 44, 56; *See also Nix v. Major League Baseball*, Case No. 1:16-cv-05604 (S.D.N.Y. 2016)["Nix NY Fed. Comp."](emphasis added).[7]

Defendants were certainly aware that deer antler was not a prohibited substance because they published articles *more than two years prior to the July 14, 2016 article* in which they reported that WADA dropped deer antler velvet from its list of banned substances.  *See* Comp. ¶ ¶ 28, 30;

---

[7]    While a district court cannot take judicial notice of the veracity of documents filed in other federal district courts, it can take judicial notice of their existence.   *United States v. Jones*, 29 F.3d 1549, 1553 (11th Cir. 1994); *Universal Express, Inc. v. S.E.C.*, 177 Fed.Appx. 52, 53 (11th Cir. 2006).

*see also* Exhibit E.  Defendants also were aware of the Biogenesis investigation at that time and the allegations accusing it of selling illegal drugs to MLB players since they had written numerous articles on it before July 14, 2016.  *See* Exhibit F.  And they were aware, or at least should have been aware, that Nix did not supply MLB players with any supplements because he said so in the July 16, 2016 complaint.

On December 26, 2017, Nix served each of the Defendants with notices pursuant to Fla.Stat. § 770.01 explaining why the statement was defamatory and demanded that they retract it. The Defendants each refused to do so, prompting the filing of this action.

## THIS COURT SHOULD DENY THE MOTIONS TO DISMISS

I. **Florida Choice-of-Law Principles Requires the Application of Florida Law to the Claims Against the Defendants**

   A. **Restatement Conflict-of-Laws Principles Give Primacy to the State Where the Plaintiff Suffered the Greatest Injuries.**

As a threshold matter, the Court must first determine what state's law applies to the claims alleged in the complaint.  A federal court exercising diversity jurisdiction must apply the choice-of-law rules of the state in which it sits.  *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941).  See *Bishop v. Florida Specialty Paint, Co.*, 389 So.2d 999, 1001 (Fla. 1980). These sections provide, respectively, in relevant part:

> (1) The rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue,[8] has the  most significant relationship to the occurrence and the parties under the principles stated in § 6.
>
> (2) Contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:

---

[8] Under Florida law, statutes of limitations are considered substantive in nature.  *Western Group Nurseries, Inc. v. Ergas*, 211 F.Supp.2d 1362, 1366 (S.D. Fla. 2002); *Merkle v. Robinson*, 737 So.2d 540 (Fla. 1999).

     (a)  the place where the injury occurred,
     (b) the place where the conduct causing the injury occurred,
     (c) the domicile, residence, nationality, place of incorporation, and place of business of the parties, and
     (d) the place where the relationship, if any, between the parties is centered.

These contacts are to be evaluated according to their relative importance with respect to the particular issue.

Restatement (Second) Conflicts of Law § 145.

***

In an action for a personal injury,[9] the local law of the state where the injury occurred determines the rights and liabilities of the parties, unless, with respect to the particular issue, some other state has a more significant relationship under the principles stated in § 6 to the occurrence and the parties, in which event the local law of the other state will be applied.

Restatement (Second) Conflicts of Law § 146.  Comment (e) to § 146 goes on to note:

\

On occasion, conduct and personal injury will occur in different states. *In such instances, the local law of the state of injury will usually be applied to determine most issues involving the tort* (see § 145, Comments *d-e*, and §§ 156-166 and 172). One reason for the rule is that persons who cause injury in a state should not ordinarily escape liability imposed by the local law of that state on account of the injury. Moreover, the place of injury is readily ascertainable. Hence, the rule is easy to apply and leads to certainty of result.

Restatement (Second) Conflicts of Law § 146, Cmt. (e) (emphasis added).

In addition, Section 150 (2) of the Restatement (Second) of Conflicts provides:

When a natural person claims that he has been defamed by an aggregate communication, the state of most significant relationship will usually be the state where the person was domiciled at the time, if the matter complained of was published in that state.

---

[9] Causes of action for defamation are actions for personal injury. *Int'l Star Registry of Illinois v. Omnipoint Mktg., LLC*, 510 F. Supp. 2d 1015, 1022 (S.D. Fla. 2007); *Rindley v. Gallagher*, 890 F. Supp. 1540, 1549-50 (S.D. Fla. 1995).

In other words, Section 150 (2) creates a rebuttable presumption that the choice of law to be applied to claims of multi-state defamation is the state where the plaintiff was domiciled, which in this case was Florida, *see* Nix Aff. ¶ 6,  and that absent compelling proof to the contrary, the state where the person was domiciled is the state where the injury is presumed to have occurred.[10]

### B.      Florida Has a More Significant Relationship to the Parties and Occurrences in This Case Than New York.

The Defendants argue that New York law should apply because the story contains a New York dateline and the writing and decision to publish the article was made in New York.  The fact that the story contains a New York dateline, however, does not establish that New York has the most significant relationship to the defamation issue.  Rather, the appropriate inquiry under §§ 146 and 150 of the Restatement is where Nix and DNA Sports suffered the greatest injury to their business and reputation.  *See* Restatement (Second) of Conflicts § 150 (2);  *Levine v. CMP Publications, Inc.*, 738 F.2d 660, 668 (5th Cir. 1984)(affirming district court's decision to apply the law where the plaintiff was domiciled at the time he was defamed and adhering to Restatement (Second) of Conflicts § 150 (2); "[i]t is clear to us, based on Texas' strong expression of interest in protecting its citizens from defamation, Texas courts would not apply New York law to this

---

[10] Defendants note that this Court recently declined to apply Florida law in an action brought by a resident of the Republic of Cyprus and his Luxembourg-based companies.  *Gubarev v. Buzzfeed, Inc.*, Order on Motion for Partial Judgment on the Pleadings With Respect to Defendants' Affirmative Defenses of "Fair Report Privilege" and "Neutral Reporting Privilege," Case No. 17-cv-60426—UU.  However, the individual plaintiff and one of the corporate plaintiffs in that case were not seeking to apply the law where they were domiciled.  Additionally, unlike Nix and his company, both of which were domiciled in Florida at the time the defamatory statements were published, the plaintiffs in that case did not have a strong connection to Florida.  Additionally, and perhaps most importantly, the issue of choice of law came before the Court in *Gubarev* on Plaintiff's Motion for Partial Judgment on the Pleadings after defendant had filed an answer and affirmative defenses to the complaint.  Here, defendants seek to have this Court summarily dismiss this case on statute of limitations grounds and to determine the applicability of defenses without any discovery and before an answer has even been filed.

case"); *Williams v. United States*, 71 F.3d 502 (5ᵗʰ Cir. 1995)(applying Texas law, where plaintiff and his business were domiciled, rather than the law of the District of Columbia, where defamatory statements were made, since resulting harm occurred in Texas); *Marcone v. Penthouse Int'l Magazine for Men*, 754 F.2d 1072 (3ʳᵈ Cir. 1985); *Mzamane v. Winfrey*, 693 F.Supp.2d 442, 471 (E.D. Pa. 2010)(noting that "the majority of courts confronted with [the] choice of law question [in defamation actions] have found that the plaintiff's domicile should control since this is the forum with the greater interest")(citing cases); *Adelson v. Harris*, 973 F.Supp.2d 467 (S.D.N.Y. 2013)(same); *Abadian v. Lee*, 117 F.Supp.2d 481(D. Md. 2000)(applying Virginia law to multistate defamation case because plaintiff resided in Virginia "and likely suffered the most damage to her reputation in Virginia"); *Wilkow v. Forbes*, 2000 WL 631344 (N.D. Ill., May 15, 2000), * 6 ("The Restatement notes that, where the privilege laws in the state of injury and the state of conduct differ, 'the state of injury would have an obvious interest in providing compensation for injuries suffered within its territory and thus in having its rule of liability applied."). Furthermore, while AP made the decision to publish its article in New York, ESPN and USA Today presumably did not, since neither company is headquartered in New York.[11]

The result would be  the same under an analysis of the factors laid out in Section 145(2) and 6(2) of the Restatement.  Although the statement was published on the internet, and therefore not confined to Florida, the majority of the injury to both Nix and Sports DNA occurred in Florida. Nix Aff, ¶¶ 10-11.  Thus, the place of injury weighs strongly in favor of the application of Florida law.  Similarly, although the decision to publish the statement occurred in New York, the tort of defamation occurs where the defamatory material is published, not where it originated from.

---

[11] ESPN's website lists its headquarters as being located in Bristol, Connecticut.  According to USA Today's website, its headquarters are located in McLean, Virginia.

*Casita, L.P. v. Maplewood Equity Partners, L.P.*, 960 So.2d 854, 857 (Fla. 3rd DCA 2007). Moreover, Florida has a strong interest in protecting its citizens from defamation and in protecting their justified expectation that they will be able to sue in Florida for defamatory statements that are read and received in Florida. *See Internet Solutions Corp. v. Marshall*, 39 So.3d 1201 (Fla. 2010); *Nordlicht v. Discala,* 139 So.3d 951, 954 (Fla. 4th DCA 2014)("As this defamation can be considered a tortious act directed at Florida and its residents, the courts of Florida should be open to its resolution").[12]

In sum, AP has offered no evidence to rebut the presumption that the law of the state where the plaintiffs were domiciled at the time the defamatory statements were published—Florida— should govern this case.  Because Nix and DNA Sports both resided in Florida at the time the defamatory articles were published and suffered far more damage to their relationships and reputations in Florida than in New York,  Florida plainly has a far more significant relationship to both the parties and the occurrences in this case than New York does.  Accordingly, the Court should apply Florida law to the defamation claim and the statute of limitations for filing it.[13]

---

[12] While the forums where each of the defendants reside may arguably have an interest in determining the applicability of their privilege defenses, that interest is no more forceful than Florida's interest in protecting its citizens from defamatory statements made by non-residents. *Nordlicht,* 139 So.3d 954.  Moreover, ESPN and USA Today, who are citizens of Connecticut and Delaware respectively, have failed to offer any explanation why the laws of those states should not apply to them, since that is where they made their editorial decisions.  Presumably this is because both Connecticut and Delaware, like Florida, have a two year statutes of limitations on defamation actions.  *See* Ct. Sec. 52-597; 10 Del.C.Sec. 8119.  Regardless, it is clear that applying the privilege laws of three different jurisdictions would in no way promote predictability and uniformity of result.

[13] Defendants do not dispute that Nix's claim for defamation is timely under Florida law.  The articles at issue in this case were each published on July 14, 2016 and the complaint in this case was filed on March 13, 2018, well within the two year statute for defamation claims under Florida law.  *See*  Fla.Stat. § 95.11.

**II.      The Complaint states a cause of action for defamation against The Defendants.**

To state a claim for defamation, the plaintiff must allege: (1) a false and defamatory statement of and concerning the plaintiff; (2) unprivileged publication to a third party; (3) fault amounting to at least negligence on the part of the publisher; and (4) damages.  *Jews v. Jesus, Inc. v. Rapp*, 997 So.2d 1098 (Fla. 2008).   Additionally, Florida recognizes a cause of action for defamation by implication.   *Rapp*, 997 So.2d at 1098.   "Defamation by implication arises, not from what is stated, but from what is implied when a defendant (1) juxtaposes a series of facts so as to imply a defamatory connection between them, or (2) creates a defamatory implication by omitting facts, [such that] he may be held responsible for the defamatory implication." *Id.* at 1106 (quoting W. Page Keeton et al, *Prosser & Keeton on the Law of Torts* § 116, at 117 (5th ed. Supp. 1988)); *Boyles v. Mid-Fla. Television Corp.*, 431 So.2d 627 (Fla. 5th DCA 1983)(reversing dismissal of libel per se claim based on statements that implied that plaintiff was a suspect in the death of a child, was a habitual tormentor of retarded patients, and had raped a patient in his care), *approved,* 467 So.2d 282 (Fla. 1985); *Trujillo v. Banco Central Del Ecuador*, 17 F.Supp.2d 1334, 1339 (S.D. Fla. 1998)("falsity may consist in untrue imputation as well as direct statement").   In determining whether a statement is defamatory, the publication of the statement must be viewed in its totality.   *Smith v. Cuban Amer. Nat'l Found.*, 731 So.2d 702, 704 (Fla. 3rd DCA 1999)("[T]here is no way to determine the 'gist' or 'sting' of the publication in the mind of the average [reader] without examining the statement in context."); *Byrd v. Hustler Magazine, Inc.*, 433 So.2d at 595 (noting that "stories are to be read with their headlines"); *Hay v. Independent Newspapers, Inc.*, 450 So.2d 293, 295 (Fla. 2nd DCA 1984)(court must consider the context in which the statements were published, including the medium of expression and its audience).   The test is whether the statement as published would have a different effect on the mind of the reader

10

from that which pleaded truth would have produced. *McCormick v. Miami Herald Pub. Co.*, 139 So.2d 197, 200 (Fla. 2nd DCA 1962); *Valentine v. CBS, Inc.*, 698 F.2d 430 (11th Cir. 1983). Although the issue of whether a statement is defamatory is a question of law, where a publication is susceptible of two reasonable interpretations, one of which his defamatory, the issue of whether the publication is actually defamatory is a question of fact for the jury. *Belli v. Orlando Daily Newspapers, Inc.*, 389 F.2d 579 (5th Cir. 1967); *Klayman v. Judicial Watch, Inc.*, 22 F.Supp.3d 1240 (S.D. Fla. 2014); *Miami Herald Pub. Co. v. Ane*, 423 So.2d 376 (Fla. 3rd DCA 1982).

### A.     The Fair Reporting Privilege Is Inapplicable Because The Publication Was Not "Fair and Accurate."

With respect to media defendants, the news media has a qualified privilege to accurately report the information they receive from government officials. *Woodward v. Sunbeam Television Corp.*, 616 So.2d 501 (Fla. 3rd DCA 1993). The privilege includes the publication of "the contents of an official document, *so long as their account is reasonably accurate and fair.*" *Id.* (emphasis added). "[A]lthough it is unnecessary that a report protected by the fair report privilege be exhaustive and complete, *it is necessary that nothing be omitted or misplaced in such a manner as to convey an erroneous impression to those who hear or read it.*" Restatement (Second), Torts, § 611, comment f (1977)(emphasis added). Whether a privilege has been established is a question of law *after all of the facts and circumstances surrounding the communication have been revealed*. \**Tucker v. Resha*, 634 So.2d 756, 758 (Fla. 1st DCA 1994)(emphasis added).

The Defendants argue that "court records" establish as a matter of law that the reporting about Plaintiffs' lawsuit against MLB was fair and accurate. It is unclear what "court records" AP is referring to. Presumably AP is referring to the complaint filed by Nix and DNA Sports on July 14, 2016, since that is the subject of the article in question. Assuming that to be the case, the author of the story presumably would have read *the entire complaint* and realized that it contained

allegations that specifically controvert the defamatory statement at issue. *See* Nix NY Fed Ct. Comp, ¶ 33, 35, 42, 43, 44, 56. The author also would presumably have reviewed the February 18, 2014 complaint filed by Nix and DNA Sports in Florida state court, since the article specifically discusses its contents and procedural history. A cursory review of *that complaint* would have drawn the author's attention to paragraphs 94 and 95 of the February 18, 2014 complaint, which alleged:

> 94.     Concomitantly*, neither NIX and DNA has ever sold any athlete a substance that was banned or even cautioned against at the time by their sport's governing body* (as Defendant MLB is with respect to professional baseball), irrespectively of whether the substance is sold directly, through a third party, by referral to DNA's website, or in any other fashion; as such, at all times pertinent hereto, the only way an athlete could have obtained a substance that his governing body had banned or cautioned against would have been by purchasing it from DNA's website, without NIX or DNA's knowledge.

> 95.     Furthermore, upon information and belief, not only was such a purchase never made from DNA's website by or on behalf of any athlete, but there has not been a single instance in which any athlete has been caught, questioned, tested positive, investigated, disciplined and/or banned due to using any of DNA's products.

*See Nix v. MLB*, Case No. 14-004294 CA 01, Miami-Dade County ["The Fla. State Ct. Comp."](emphasis added).

Regardless of which court records the Defendants are referring to – the complaint in the New York federal district court case or the 2014 state court complaint in Florida, or both—it is clear that deer antler was not on MLB's list of banned substances, and neither Nix nor DNA ever admitted that they used or sold products on baseball's list of banned substances.

The Defendants argue that the News Stories cannot be construed as defamatory as a matter of law because no reasonable reader could construe them as implying that Nix and DNA Sports supplied illegal drugs to MLB players, or legal drugs in an illegal manner. That is simply not the case. The article states: "The suit admits Nix and his company used bioidentical insulin like growth factor (IGF-1), *which is derived from elk antlers and is on baseball's list of banned*

*substances*." (emphasis added).   A reader reading that sentence could reasonably construe it to mean that Nix and DNA Sports admitted to using a product which was on baseball's list of banned substances, which they clearly did not, or that deer antler was on baseball's list of banned substances, which it was not.  Moreover, a reader reading that sentence in context with the last two paragraphs of the AP article – the first of which states that Nix's lawyer represents a former MLB player who tested positive three times for drugs, and the second of which discusses the Biogenesis investigation and the suspensions that resulted from it--could reasonably read it to imply that bioidentical insulin like growth factor is an illegal substance, which it is not, and that Nix and DNA Sports sold illegal substances to MLB players, which they did not.  *Rapp*, 997 So.2d at 1106; *Turner v. Wells*, 879 F.3d 1254, 1269 (11th Cir. 2018)(noting that defamation by implication arises when a defendant "juxtaposes a series of facts so as to imply a defamatory connection between them, or creates a defamatory implication by omitting facts").  Either way, the statement conveys an erroneous and defamatory impression that cannot be considered "fair and accurate."  *See Boyles*, 431 So.2d at 627;  Restatement (Second), Torts, § 116, 611, comment f (1977).

This is not a case where the defamatory statement was imprecise or mistaken with respect to  immaterial details, like the cases cited in AP's Motion at 11-14.  Nor is it analogous to, as AP suggests, a case involving an editorial decision, such as whether to place the story "on page one with a banner headline or on the last page of the last section." *Jamason v. Palm Beach Newspapers*, 450 So.2d 1130, 1132 (Fla. 4th DCA 1984).  Rather, the statement in this case is defamatory because it falsely asserts that Nix and DNA Sports admitted to using banned substances.  The statement is also defamatory by implication since it clearly implies, when juxtaposed with the rest of the article discussing the Biogenesis investigation and MLB players who tested positive for

illegal drugs, as well as the headlines, that Nix and DNA Sports admitting to using or distributing illegal drugs. *Turner*, 879 F.3d at 1269.

Furthermore, because the defamatory statement in the July 14, 2016 articles must be read in context with the contents of the entire article, it is impossible to evaluate whether the statement was defamatory and the privileges asserted by the Defendants are applicable without knowledge of the facts surrounding the Biogenesis scandal and the circumstances giving rise to the 2014 Florida complaint. That, however, would require the court to look beyond the four corners of the complaint to evidence concerning each of those matters, which it cannot do on a motion to dismiss. Furthermore, it would be premature at this juncture for the court to rule as a matter of law on whether the statement and the article were "fair and accurate," since all of the facts and circumstances surrounding the statement have not yet been discovered. *See Tucker*, 634 So.2d at 758. For this reason alone, the motion to dismiss should be denied.

**B.      Nix and DNA Sports are not "public figures."**

Defendants do not contend that either Nix or DNA Sports are general public figures. Rather, they simply assert – without any legal support-- that they are limited public figures. They are wrong. There are two classes of public figures: "general" and "limited." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323 (1967). A general public figure is well-known, a household name, and "[t]he public re cognizes him and follows his words and deeds, either because it regards his ideas, conduct, or judgment as worthy of its attention or because he actively pursues that consideration." *Waldbaum v. Fairchild Publications, Inc.*, 627 F.2d 1287, 1294 (D.C. Cir. 1980). "A limited purpose public figure is 'an individual [who] voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues.'" *Little v. Breland*, 93 F.3d 755, 757 (11th Cir. 1996) (quoting *Gertz* 418 U.S. at 351). Although

"general public figure" is attained by very few,  the courts must still examine "the nature and extent of an individual's participation in the particular controversy giving rise to the defamation."  *Id*. at 352.   Whether  the  plaintiff  is  a  public  figure  is  a  question  of  law  for  the  court  to  resolve. *Waldbaum*, 327 F.2d at n.12.

The Eleventh Circuit has adopted the three part test enunciated in *Waldbaum* to determine if the plaintiff is a limited purpose public figure.  *See Silvester v. American Broadcasting Co., Inc.*, 839 F.2d 1491, 1494-95 (11th Cir. 1988).  The court must  first determine the existence of a public controversy.  *Breland*, 93 F.3d at 757.  To satisfy this requirement,  a controversy must be debated publicly **and**  the  resolution  of  the  controversy  must  foreseeably  affect  nonparticipants  of  the controversy.  *Walbaum*, 627 F.2d at 1296-97 ("[P]rivate concerns or disagreements do not become public controversies simply because they attract attention."  *Waldbaum*, 627 F.2d at 1296 (citing *Time,  Inc.  v.  Firestone*,  424  U.S.  448,  454-55  (1976));  *Silvester*,  839  F.2d  at  1494  (public controversy must be more than "merely newsworthy");  *Wolston v. Readers Digest Association, Inc.*,  443  U.S.  157,  167  (1979)  ("The  private  individual  is  not  automatically  transformed  into  a public  figure  just  by  becoming  involved  in  or  associated  with  a  matter  that  attracts  public attention.").

Once it has isolated the specific controversy, it must then  examine the extent to which the plaintiff  is  in  the  controversy.    *Id*;   *Silvester*,  839  F.2d  at  1496.   A  plaintiff  must  be  more  than "tangential participants in the controversy" to qualify as limited public figures.  *Waldbaum*, 627 F.2d at 1297.  Rather, he must have "voluntarily thrust himself into the controversy in such a way that he (1) tried to influence the outcome of the public controversy or (2) realistically expected to have  an  impact  on  its  resolution  given  his  position."   *Carroll  v.  TheStreet.com,  Inc.*,  2014  WL 5474061, at *14 (S.D. Fla. July 10, 2014); *see Waldbaum*, 627 F.2d at 1297; *Della-Donna v. Gore*

*Newspapers Co.*, 489 So.2d 72 (Fla. 4ᵗʰ DCA 1986); *Waterman*, 595 So.2d at 87 (the mere fact that the press is attracted to a particular person or activity does not make that person a public figure).   Finally, the court must make a determination whether the alleged defamation [was] germane to the plaintiff's participation in the controversy.'"   *Breland*, 93 F.3d at 757 (quoting *Silvester*, 839 F.2d 1491, 1494 (11th Cir. 1988)). A plaintiff's participation in a controversy is only germane if  "a reasonable person would have concluded that [the plaintiff] would play or was seeking to play a major role in determining the outcome of the controversy and whether the alleged defamation related to that controversy." *Id*.

Here, the first prong fails because the controversy was initiated by MLB when they improperly targeted and investigated a private individual, Nix, and his private company about using and/or dealing MLB banned substances to MLB players.  Nix and his company had no legal relationship with MLB, nor did it market, advertise, or knowingly sell its products to any player affiliated with MLB.  Nix Aff. ⁋ 7.  Moreover, the resolution of the controversy would not affect nonparticipants to the controversy because the controversy is, and always has been, limited to an improper investigation initiated by MLB into an unaffiliated, unrelated, private individual, his private company, and their unrelated-to-MLB business dealings; any resolutions to their controversy would be entirely inapplicable to all nonparticipants.  Succinctly put, this is a private controversy between a private vendor and a high-profile organization whose every action attracts attention; MLB's clear status as a general public figure cannot alone carry their dispute with Nix to a public controversy.

The second prong also fails because Plaintiffs did not voluntarily thrust themselves into the controversy; rather, MLB improperly targeted and investigated Plaintiffs wholly unrelated business dealings.  "Resort to the judicial process by [Nix and DNA Sports] is no more voluntary

in a realistic sense than that of the defendant called upon to defend his interests in court." *Boddie v. Connecticut*, 401 U.S. 371, 376–77 (1971). The private controversy was triggered by MLB against Nix, a private individual and his private company. Just as a doctor filing suit against Medicare for improperly investigating the doctor's business could not be deemed to have voluntarily thrust himself into a public controversy regarding Medicare policy, neither Nix nor DNA Sports can be held to have thrust themselves into a controversy generated by MLB.. Moreover, any press explanations, media corrections or discussions regarding the controversy do not, prima facie, give rise to an individual attempting to play a significant role in the controversy; Nix assumed no "special prominence in the resolution of public questions." *Gertz*, 418 U.S. at 351; *see Waldbaum*, 427 F.2d at n.31 (opining that plaintiff's press release and media inquiries "does not necessarily mean that a person is attempting to play a significant role in the controversy.")

Because there is no public controversy into which Nix and DNA Sports voluntarily thrust themselves into, neither of them are limited purpose figures.

### C. The complaint sufficiently alleges fault on the part of the Defendants.

Defendants alternatively argue that the Complaint should be dismissed because "plaintiffs could never establish negligence" on their part. The allegations in the complaint, however, clearly belie that claim. The complaint alleges that if the Defendants had fact-checked their story against the 2014 lawsuit they reference in the article containing the alleged defamatory statement that they would have discovered it was false. Comp., ¶ 27. The clear implication from this allegation is that the Defendants did not do so. More importantly, the complaint also alleges that ESPN published an article several years prior to the alleged defamatory statement which stated that deer-antler velvet containing IGF-1 was no longer a prohibited substance by WADA, and that AP and

17

USA both previously reported that IGF-1 in the form of deer antler is not a banned substance. Comp. ¶ 28, 30.  The complaint also provides links to the actual articles it references.  In addition, the complaint alleges that plaintiffs demanded that the Defendants retract the article, and provided them with proof that the statement was false.  Comp., ¶ 31.  These allegations are more than sufficient to establish not only negligence on the part of each of the Defendants, but that the publication was made "with knowledge that it was false or with reckless disregard of whether it was false or not," which is the standard for pleading actual malice.  *See Gertz*, 418 U.S. at 342, 94 S.Ct. at 2997.

The Defendants argue that it is irrelevant whether WADA considered deer antler as a banned substance because "MLB includes IGF-1 on its list [of Prohibited Substances] and has re-confirmed this list bans all forms of the substance."  However, the Defendants knew or should have known that this was untrue because Rob Manfred, Major League Baseball's Vice President of Labor Relations, testified on March 17, 2005 before a congressional committee that Major League Baseball did not prohibit substances which could be lawfully obtained.  It also ignores the fact that the head of science for WADA has testified that deer antler products are not prohibited or illegal substances, even if they contain minute amounts of IGF-1, and that WADA performs the drug tests for MLB pursuant to MLB's collective bargaining agreement with its players.  *See Singh* Case No. 2013-651659, Doc. No. 43, 43-48, attached hereto as Exhibit G.  Had the Defendants read the 2014 and 2016 complaints in their entirety, they would have known that deer antler was a lawfully obtainable substance.  That they either chose not to do so, or intentionally ignored the allegations concerning deer antler, is certainly sufficient to establish actual malice.[14]  *See Michel*,

---

[14] Even if the allegations in the complaint are insufficient to give rise to plead actual malice on the part of the Defendants, Nix and DNA Sports must be given the opportunity to amend their complaint.  *Michel v. NYP Holdings, Inc.*, 816 F.3d 686, 706 (11th Cir. 2016)("A dismissal based

816 F.3d at 703 (evidence showing that defendant purposely avoid further investigation with the intent to avoid the truth would establish actual malice).

### D.   ESPN and USA Today cannot avail themselves of the wire service privilege.

ESPN and USA Today also argue that the case should be dismissed against them because they relied on AP as the source for their reporting.  While it is true that the mere reiteration in a daily newspaper of an actually false, but apparently authentic news dispatch, received by a newspaper publisher from a generally recognized wire service such as AP cannot give rise to liability in the absence of independent fault on the part of the newspaper, where a plaintiff can show that the paper has acted negligently, recklessly, or in a careless manner in reproducing the story, the wire service privilege does not apply.  *Layne v. Tribune Co.*, 146 So.234 (Fla. 1933).

The Complaint in this case alleges facts sufficient to establish that both ESPN and USA Today were negligent and/or reckless in publishing the story.  *See* Sec. II, Part C, *supra*. ESPN was particularly reckless in doing so, both because it had extensively reported on the Biogenesis scandal previously, placed the reference to Biogenesis in its headline, and had published an article on deer antler not being considered by WADA as a prohibited substance several years before the July 14, 2016 article was published.  Certainly at this initial stage of the case, where the parties have not had any opportunity to conduct discovery on the issue of privilege, dismissal of the complaint on the affirmative defense of privilege is inappropriate.

### E.   Plaintiffs provided sufficient notice pursuant to Fla.Stat. § 770.01.

Finally, Defendants claim that Nix and DNA Sports failed to comply with Fla.Stat. § 770.01.  This argument is easily disposed of.  Fla. Stat. § 770.01 provides: "Before any civil action

---

on the failure to plead facts giving rise to an inference of actual malice should be without prejudice and the plaintiff should have the opportunity to amend his complaint.")

is brought for publication or broadcast, in a newspaper, periodical, or other medium, of a libel or slander, the plaintiff shall, at least 5 days before instituting such action, serve notice in writing on the defendant, specifying the article or broadcast and the statements therein which he alleges to be false and defamatory." That is precisely what Nix and DNA Sports did. On December 26, 2017, Nix and DNA served a notice to each of the Defendants with a link to the article in question, in which they specifically identified in bold faced type the defamatory statement. *See* Composite Exhibit H. On March 13, 2018, they filed this action in state court. Defendants have not pointed out any reason why these notice letters are defective for a simple reason: they are not. To the extent the Defendants did not receive the notice for whatever reason, the issue is academic since Plaintiffs are entitled to cure the defect by reserving the notice prior to the time the statute of limitations runs, which they have. *See Bayliss v. Cox Radio, Inc.*, 2010 WL 4023459, at *4 (M.D. Fla., Oct. 13, 2010).

<u>**CONCLUSION**</u>

For all the foregoing reasons, The Defendants' Motions to Dismiss should be denied.

**THE LAW OFFICE OF**
**DAVID H. POLLACK, LLC**
Attorney for Plaintiff
2600 Douglas Road, Suite 1007
Coral Gables, Florida 33134
Telephone: (305) 372-5900
Facsimile: (305) 372-5904

By   */s/ David H. Pollack*
**DAVID H. POLLACK, ESQ.**
FLA. BAR NO. 0955840

20

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 22nd day of June, 2018, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

By:     /s/ David H. Pollack
David H. Pollack, Esq.
Florida Bar No.: 955840

## <u>SERVICE LIST</u>

THOMAS & LOCICERO PL
Carol Jean LoCicero
Allison Kirkwood Simpson
601 South Boulevard
Tampa, FL 33606
Telephone: (813) 984-3060
Facsimile: (813) 984-3070
clocicero@tlolawfirm.com
asimpson@tlolawfirm.com